**James H. HORTON, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**Clinton E. JOHNSON, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**Nos. 13321, 13322.**

United States Court of Appeals
Sixth Circuit.

June 12, 1958.

William E. Badgett, Knoxville, Tenn. (John R. Todd, Kingsport, Tenn., on the brief), for appellants.

John F. Dugger, Asst. U. S. Atty., Knoxville, Tenn. (John C. Crawford, Jr., and James M. Meek, Knoxville, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

SIMONS, Chief Judge.

On November 4, 1956, while a strike was in progress by the employees of the Blue Ridge Glass Corporation, a portion of track of the Clinchfield Railroad Company, leading to the plant of the employer, and concededly a highway of interstate commerce, was blown up by dynamite. The appellants and a striker named Million were indicted on two counts, one for conspiring to blow up the track and one for the substantive offense. Million pleaded guilty and was the principal witness for the United States at the trial. The jury returned a verdict of guilty on both counts against appellant Horton and on the conspiracy count alone against appellant Johnson, acquitting Johnson of guilt for the substantive offense.

Subsequently, the appellants discovered that all members of the jury panel had been given the "Handbook for Jurors Serving in the United States District Courts". Based on this discovery, appellants moved for a new trial on the ground of newly discovered evidence and upon a denial of their motion they perfected their appeals. The question based upon the handbook is the important question in the case, was vigorously presented both on briefs and in oral argument and will be disposed of after a consideration of procedural issues involved.

In support of the indictment, Million testified that on November 2, 1956 he

agreed with appellant Horton that they would blow up the railroad to prevent delivery of supplies to the Blue Ridge Glass Company; that he had some dynamite which he had received from appellant Johnson some ten days before; that while this dynamite was not used in the blowing up of the track because he lacked caps and fuse, he went to Johnson to get them, intending to use the dynamite previously obtained from Johnson in the commission of the crime, that he obtained the caps and the fuse on November 2d, at which time Johnson furnished him with another package of dynamite and that this was the dynamite used in the explosion of the railroad track. He testified that when he went to Johnson to obtain the caps and fuse he told him that he and Horton were going to use the dynamite in the blowing up of the railroad. The dynamite first received by Million was concealed in some bushes on the property of a neighbor, Mrs. McCurry. The dynamite obtained on Friday before the crime was also concealed on Mrs. McCurry's property but in a different place than the other explosive. He met Horton on Saturday, November 3d, and was told by Horton that he would be unable to meet him that night to blow up the track. Arrangements were then made for Horton to meet Million on Sunday evening to accomplish their purpose. At a prearranged signal of three blasts on an automobile horn Million left his home Sunday evening, put the dynamite, caps and fuse in his truck and drove off, with Horton following in his own car. Soon after leaving his home, Million stopped, took the dynamite to Horton's car in which both proceeded to the railroad track where they set the dynamite and blew up the track. While in Horton's car, beating a hasty retreat, Horton discovered that Million had not worn gloves and because they feared that Million's fingerprints would be on the fuse, they returned, picked up the burned fuse and again hastily retreated. Horton returned Million to his truck and Million went on picket duty in the early morning of November 5th. Following picket duty, Million returned to his home, took the burned fuse to his neighbor's property and concealed it, as he had the first package of dynamite.

To a somewhat limited but important extent, Million's narrative was corroborated. His eleven year old daughter heard three "toots" on an automobile horn just before her father left on Sunday evening, November 4. Mrs. McCurry found the burned fuse on her property at the place where Million said he had thrown it several days after the blowing up of the track. Witness Shupe testified that later he received a package of dynamite from Million. Shupe had gone to Million for the dynamite, at the request of a railroad detective Peterson. Peterson testified that he received this package from Shupe in November or December, 1956, and identified its wrappings. Mrs. McCurry had given him twenty eight feet of burned fuse on the 8th or 10th of November which Peterson delivered to the FBI Agent, Barrett. Barrett's testimony was that he had measured with his speedometer the distance from Horton's home to Million's home, from Million's home to the scene of the explosion, and that the time required in traveling between these points corroborated Million's testimony as to their movements on the night of the crime.

Both appellants gave evidence denying connection either with the substantive offense or the conspiracy. Horton swore that at the time of the crime he was visiting his brother-in-law and family and Horton's ten year old daughter supported this alibi. Johnson testified that he had furnished dynamite to Million upon only one occasion, about ten days prior to the blowing up of the track; that it was to be used in coal mining operations; that the package of dynamite contained caps and fuse. Both appellants put their own reputations in issue and attacked Million as a man of poor character and reputation.

The procedural errors relied upon in the appeal related to the admission of testimony that Million gave dynamite to Shupe more than a week after the crime;

that on cross examination of Johnson, the district attorney observed that the testimony of the appellants was "wind" and remarked that he "would not give a nickel for a dozen of them," in reference to Horton's offer to take a lie detector test; that error was committed in the cross examination of character witnesses when they were asked if they knew of a series of convictions for drunkenness and appellant Horton's contention that certain rebuttal testimony was inadmissible because a proper foundation for impeaching testimony was not laid.

Shupe's testimony that Million gave him dynamite more than a week after the crime was, doubtless, irrelevant and should not have been received if proper timely objection thereto had been urged. The admission of the tape which bound the dynamite, previously referred to, was objected to but only after all the testimony concerning this particular dynamite was received without objection. We are not persuaded that the admission of Shupe's testimony in this regard constitutes such plain error as calling for reversal under Rule 52 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. The observations made by the district attorney in cross examination of Horton, while not to be commended, do not, in our judgment, constitute reversible error. A vigorous prosecutor may at times use intemperate language but that is, of course, subject to the control of the trial judge, with or without objection, for it must be remembered that the district attorney is an advocate, as is counsel for defense. The observations complained of as depriving the appellants of a fair trial do not compel reversal. Henderson v. United States, 6 Cir., 218 F.2d 14, 19, 50 A.L.R.2d 754. The argument that there was error in cross examining character witnesses must be rejected. Once a defendant puts his character in evidence, it is proper to cross examine the witnesses as to their basis for judgment, and even to question them as to rumors concerning the defendants. Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168.

Appellant Horton was asked upon cross examination whether or not he told an insurance adjuster what time he wrecked his car on the night of the crime. His reply was that it was about midnight on the night in question. The government recalled, as a rebuttal witness, the adjuster who testified that Horton told him that the accident happened at approximately 10:30 P. M. Horton contends that it was error to receive this impeaching evidence because of the lack of a proper foundation therefor. The record disposes of the contention. Horton's insistence that the accident happened at midnight is sufficient foundation for the rebuttal.

There was substantial evidence to connect both appellants with the crimes charged in the indictment. It is not for us to pass upon the credibility of witnesses. That is the function of the jury.

This brings us to the really important issue in the case. As already indicated, the appellants moved for a new trial on the ground of newly discovered evidence, based upon the handbook for jurors. Overruled by the district court as without merit, the order of dismissal now constitutes the principal basis for the appeal. By stipulation of counsel, it was agreed that a copy of the handbook was given to each member of the jury panel by the clerk of the district court, that the jurors who sat in judgment upon the case were selected from such panel, that trial counsel for the appellants had no knowledge at the time of the trial that the handbook had been distributed to the jurors until the trial was over, after the jury had found the appellants guilty, after notice of appeal had been filed and the appeals perfected. By their motion for new trial, the appellants urged that the passing out of the handbook constituted a serious and prejudicial error in the trial of their cases; that the use of the handbook constituted an impingement on the jury system and an invasion of the prerogatives of Congress, and denied the appellants a fair and impartial trial. The handbook, it was urged, was likely to implant in the mind of a juror an erroneous

impression since it made no reference to the safeguards for the protection of defendants in a criminal case. Jurors were by its use officially indoctrinated with misleading and inaccurate information, when told by the challenged statement therein that a verdict of guilty does not necessarily mean that the defendants would receive a long sentence or that they will be required to serve any sentence at all that this constitutes reversible error, because it amounts to a plain invitation to the jury to return a verdict of guilty and leave the consequences to the court.

The motion for new trial was filed September 30, 1957 and denied October 4, 1957 but, since by inadvertence appellants' counsel failed to receive a notice of the order within the time to file notices of appeal, the order of October 4th was set aside on November 20, 1957 and a new order of denial entered on the same date. Rule 33 of the Criminal Rules of Procedure and the decision in Zamloch v. United States, 9 Cir., 187 F.2d 854.

When the motion for new trial was presented and argued, the case of United States v. Gordon, 7 Cir., dealing with the handbook had on July 16, 1957 been decided by a panel of the Court of Appeals for the 7th Circuit with an opinion announced on that date by Judge Major, Retired Circuit Judge, with Circuit Judges Finnegan and Schnackenberg concurring. The Gordon case is unreported because shortly after its announcement the appellant therein had sought and obtained a rehearing by the Court sitting en banc. The Court sitting upon rehearing was composed of Duffy, Chief Judge, Finnegan, Schnackenberg, Hastings and Parkinson, Circuit Judges. Judge Major, as a Retired Judge, was not authorized to sit. The Court reversed the conviction of Gordon on various grounds, United States v. Gordon, 7 Cir., 253 F.2d 177, 185, and announced, "Our former opinion of July 16, 1957 (the Major opinion) is superseded hereby and is withdrawn." The principal opinion is the cause was written by Judge Parkinson who held inter alia that Gordon had waived his right to assert error in the distribution of the handbook in the absence of a challenge to the polls for cause. Chief Judge Duffy wrote a concurring opinion in which Judge Hastings joined and Judges Finnegan and Schnackenberg wrote separate opinions the import of which seems to be that they concurred in reversal but dissented in part for failure of the Court to rely upon the distribution of the handbook as error and its failure to adhere to the Major opinion on the handbook.

The opinion of Judge Major, having been superseded and withdrawn, it would seem futile to discuss it were it not for the fact that it was relied upon and quoted *in extenso* by the dissenting judges. Stress is laid by them upon the statement therein, that the handbook invited a "guilty" verdict by stating: "A verdict of guilty does not necessarily mean that the defendant will receive a long sentence or that he will be required to serve any sentence at all. The judge may impose such sentence as appears to him to be just within the limits fixed by law or in a proper case he may suspend sentence and place the defendant on probation." Examination of the handbook shows it to be largely innocuous. If there is anything prejudicial in it, it is contained in what is quoted above and we limit our consideration to the question of prejudice. We find nothing in the challenged language that is not a correct statement of the power and duty of a sentencing judge. Moreover, in dealing with the charge of prejudice, we do not consider it as though in a vacuum, out of context and disassociated from attendant circumstances. There was no showing that any member of the jury had read the handbook. All that was before the court, as to its use, is contained in the stipulation above referred to. The contention that the challenged statement was an invitation to a wavering juror to vote "guilty" reaches the heights of speculation, and to call it "indoctrination" imports to the language an unjustified connotation in the light of what is happening in other lands in the present era.

We need not recite the long history of the handbook, since the project was inaugurated by a committee appointed by Chief Justice Stone, its consideration at various sessions of the Judicial Conference of the United States by the district judges after its submission to them under the so-called Phillips Plan, until its printing and circulation was authorized by the Conference. Chief Judge Duffy has given it in detail in his concurring opinion in the Gordon case and we need not repeat it. It is true, of course, that the distinguished character of its authors and sponsors need not deter a constitutional court from evaluating, by orderly procedures, a challenge to its validity, but it is nevertheless important to note that many highly qualified minds participated in its formulation, and numerous able and experienced trial judges sensed no infirmities in its formulation.

A careful study of the charge of the Court discloses its careful instructions in respect to the presumption of innocence, the need for proof beyond a reasonable doubt, and the caution with which the testimony of an accomplice must be considered. There were no requests for instructions and no objections to those that were given. Indeed, when counsel for the appellants was invited by the court to request further instructions, he expressed himself as follows: "We think the charge is exceedingly fair. It states the law. We have nothing to add."

The challenged language of the handbook, read in context, instructs the jurors that the Judge determines the law to be applied while the jury decides the facts, that the judge declares the law to be and his law controls, that the jury must determine what are the true facts and the jurors are sworn to disregard prejudices and follow the court's instructions and they violate their oath if they render their decision on the basis of the effect their verdict might have in other situations. To say that the challenged statement impinged upon the independent judgment of the jurors would downgrade the intelligence of Federal jurors, impute

lack of conscience to them, and defiance of judicial instructions and open the doors to innumerable appeals and petitions of guilty defendants tried by juries which had received the handbook. Upon such thin assumptions as are here advanced, this ought not to be done. The judgments below are

Affirmed.