265 F.2d 683
 Alonzo BULLOCK, William A. Brakebill, Lawrence J. Brantley,
Clyde A. Cook, Mary Nell Currier and Willard H.
Till, Appellants,
v.
UNITED STATES of America, Appellee.
Frederick John KASPER, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 13512, 13513.
 United States Court of Appeals Sixth Circuit.
 Feb. 27, 1959, As Corrected April 30, 1959, Rehearing Denied
in No. 13513 April 30, 1959, Certiorari Denied
June 15, 1959, See 79 S.Ct. 1294.
 
 Wm. M. Shaw, Homer, La., Ross Barnett, Jackson, Miss., and Robert L. Dobbs, Memphis, Tenn. (Charles A. Stainback, Somerville, Tenn., G. W. Williams, Baltimore, Md., Hansel Proffitt, Sevierville, Tenn., Grover S. McLeod, Birmingham, Ala., Wade Leonard, Rossville, Ga., Roy Asbury, Jackson, Tenn., Thomas P. Gore, Nashville, Tenn., W. E. Michael, Sweetwater, Tenn., on the brief), for appellants Bullock and others.
 J. Benjamin Simmons, Washington, D.C. (Herbert S. Ward and Harry L. Horton, Washington, D.C., of counsel), for appellant Kasper.
 Joseph M. F. Ryan, Jr., Dept. of Justice, Washington, D.C. (W. Wilson White, Asst. Atty. Gen., Harold H. Greene, D. Robert Owen and Isabel L. Blair, Washington, D.C., and John C. Crawford, Jr., U.S. Atty., Knoxville, Tenn., on the brief), for appellee.
 Before ALLEN, Chief Judge, MILLER, Circuit Judge, and THORNTON, District Judge.
 ALLEN, Chief Judge.
 
 
 1
 These appeals grew out of proceedings charging appellants and others with criminal contempt under Title 18 U.S.C. 401(3). The contempt proceedings were heard as one case in the District Court, severance having been denied. The appeals were argued separately before this court on behalf of appellants Bullock, et al., hereinafter called Bullock (Appeal No. 13,512), and by appellant Kasper (Appeal No. 13,513). Many questions raised by Bullock and by Kasper are identical and will be discussed in general without designation of particular parties. A motion for judgment of acquittal was made by all defendants and denied and the case was submitted to the jury. Four of the persons charged were acquitted, but the jury found defendants Bullock, Brantley, Brakebill, Cook, Currier, Till and Kasper guilty of criminal contempt under Title 18 U.S.C. 401(3). The District Court entered a judgment sentencing all appellants for criminal contempt of court.
 
 
 2
 The court held that appellants had violated an order of the District Court issued January 4, 1956, in McSwain v. County Board of Education of Anderson County, Tennessee, D.C., 138 F.Supp. 570, requiring the discontinuance of racial segregation in Clinton High School, Clinton, Anderson County, Tennessee, by the fall term of 1956. Pursuant to this order such integration was put into effect by the school executives and teachers. Twelve negroes were enrolled in a school having approximately 800 white pupils.
 
 
 3
 August 25, 1956, Kasper came to Clinton, and thereafter tried to induce various persons to oppose the obedience of the school officials to the order, and threatened to have the principal of the school ousted. Kasper took other steps aimed at preventing the effectiveness of integration and achieving the restoration of segregation in the high school, helping to set up widespread organizations for this purpose among the citizens and the high school students.
 
 
 4
 On the petition of D. J. Brittain, Jr., principal of the high school, and others, the court on August 29, 1956, issued a temporary restraining order against one John Kasper and others, enjoining them, 'their agents, servants, representatives, attorneys, and all other persons who are acting or may act in concert with them * * * from further hindering, obstructing, or in anywise interfering with the carrying out of the aforesaid order of this Court (the integration order of the court issued January 4, 1956), or from picketing Clinton High School, either by words or acts or otherwise.' None of the appellants in the Bullock group were named in this order. The temporary restraining order was personally served on Kasper on August 29. Thereafter, a preliminary injunction issued upon hearing and after further hearing by the District Court the injunction was made permanent on September 6, 1956.
 
 
 5
 On December 5, 1956, the United States Attorney filed a petition charging the Bullock group and others with criminal contempt for violating the injunction and on that date an order of attachment was issued by the court describing in detail certain alleged acts of criminal contempt and ordering that the persons named be apprehended and tried.
 
 
 6
 On February 25, 1957, the court exparte issued an amended order of attachment stating that the present appellants and others had actual notice of the permanent injunction of September 6, 1956, and that the present appellants and others had, during the months of November and December, 1956, 'entered into an agreement or agreements to violate and to cause others to violate' the injunction, and that these appellants and others in active concert and participation with Frederick John Kasper had violated the permanent injunction in respects set out in the amended order. Under this amended order Gates and Kasper were arrested and given bail. The trial started July 8, 1957. The overt acts referred to in the amended order of attachment were not the same as the acts charged in the original attachment order. It was charged in the amended order of attachment (1) that on or about November 27, 28, 29, 30, and December 3 and 4, 1956, appellants and others congregated in a threatening manner along the route to the Clinton High School taken by negro students and intimidated them from attending Clinton High School. Charge 2 was dropped because John Gates died before the trial. It was charged (3) that on December 4, 1956, when Rev. Paul Turner escorted the negro students to the school, he was vilified, attacked and badly beaten by appellants.
 
 
 7
 Evidence as to the following facts was shown at the trial: For a number of days in September and for several days in the latter part of November, 1956, all local newspapers and radio and television stations gave great publicity to the temporary restraining order issued by the District Court on August 29, 1956. These broadcasts and newspaper articles made it plain that the injunction prohibited interference with the integration of Clinton High School and the picking of Clinton High School.
 
 
 8
 During the week following August 27, 1956, there was considerable disturbance outside the high school. Enrollment dropped greatly but thereafter, until the end of November, the problems subsided and attendance rose. On November 27 or 28 appellants Brakebill, Brantley and Bullock stationed themselves at the street intersection which the negro children had to pass to reach the high school. Appellants remained until 8:30, the opening hour for school, or until 8:45 a.m. This surveillance was repeated every day for the remainder of the week. The negro children did not come to school. On Monday, December 3, appellants appeared again at the same place. Cook and Bullock made abusive remarks about Rev. Turner, the integrationist who planned to accompany the negro children to the school. Rev. Bullock stated that if the negro children were not taken out of the school someone would get killed.
 
 
 9
 On Tuesday, December 4, many cars were parked in the area of the road leading from the negro section to the school. Bullock, Cook and Rev. Turner were present. Cook told Rev. Turner that they wouldn't let him get away with escorting the negro children to the school. The chief of police asked Bullock to leave before there was trouble, but Bullock refused, stating, 'You want me to leave so that you can bring these colored children down here to school.' Bullock said that he was up there 'to keep us 'nigger lovers' from taking those 'niggers' to school' and that he would keep the white school white and there would be trouble. Later the same morning Rev. Turner and two other men escorted the negro children through the crowd to the school. Brakebill, Cook and Currier made threatening statements to the negro children and to the men escorting them and followed Turner and the children down the hill, obscene remarks being made. After Turner had escorted the negro children to the school and come back there was more abusive language from Brakebill, Bullock and Currier. Turner walked on and Cook attacked him. Turner backed away but was followed and Cook struck Turner, who was unarmed. Turner pushed his way through the crowd to an automobile and was pounded against the fender. Turner fell on his knees and his head was pushed against the fender while the crowd yelled 'Kill him.' The police came and arrested Cook.
 
 
 10
 Appellants did not deny this testimony. They introduced evidence that while they were opposed to integration they were seeking legal means to do away with it; that the members of the White Citizens Council, organized during this general period, did not believe in violence; that there was no trouble until the Rev. Turner decided to bring the negro children to school.
 
 
 11
 The District Court found that Kasper had actual notice of the permanent injunction of September 6, 1956. Kasper also had received personal notice of the temporary restraining order of August 29, 1956, which was served on him by the United States Marshal. Kasper took the order from the Marshal after a portion of it was read to him, stating 'I know what it is. It is an injunction prohibiting me from interfering here in this school business.' Kasper had previously been found guilty of contempt of court for inciting the citizens of Clinton and of Anderson County in a speech he made on August 29, 1956, to violate the restraining order. Kasper v. Brittain, 6 Cir., 245 F.2d 92, certiorari denied 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46.
 
 
 12
 Kasper was active in forming the White Citizens Council in Clinton and the Tennessee White Youth. He was the consultant on all questions of framing charters and in general gave advice and counsel to the groups which met at Ann's Cafe and the Southland Cafe in Clinton. Kasper was seen meeting with the students of the Clinton High School. Testimony was given as to frequent meetings in a room of the Southland Cafe. The charter of the White Citizens Council was taken out by several citizens of Clinton, including John Kasper. Kasper issued a press release in connection with the formation of Tennessee White Youth. He paid to have the charter notarized and drove around the county with those active in the formation of this group.
 
 
 13
 Kasper also directly took part in inciting individual citizens to violate the order of the court. As testified by Mr. D. J. Brittain, the principal of the High School, Kasper had the following conversation with him:
 
 
 14
 'Q. What did he say? A. Well, Mr. Kasper asked me what I was going to do in regard to getting the Negroes out of Clinton High School. And I told him I could not do anything as we were under a court order to accept these Negroes in Clinton High School.
 
 
 15
 'q. Was there anything else said between you and him? A. Yes. He stated to me that other people other places had not accepted these people. I told him that I was under the impression that these people were not under a court order as we were.
 
 
 16
 'A. Well, there was more discussion. There was several people there that asked questions and made comments, and Mr. Kasper then said, 'Let's get back to this issue.' He said, 'What are you going to do?'
 
 
 17
 'And I told him that I had only three courses. One was to obey the law, second disobey the law; third, resign my job, and that I intended to obey the law.
 
 
 18
 '* * * he finally said that they would get me out of the school before the year was over * * *.'
 
 
 19
 Similar testimony was given by James Leo Burnett, who said in answer to questions put to him:
 
 
 20
 'A. John Kasper came to my home the latter part of August. I expect it was the first day he was in town. And asked me to join in his program of ousting the Negroes from Clinton High School.
 
 
 21
 'Q. Where did you have that conversation with him? A. In my back yard.
 
 
 22
 'Q. At your home? A. Yes, sir.
 
 
 23
 'Q. Was that before or after school had started? A. That was before school started.'
 
 
 24
 Both Kasper and the Bullock group urged that the verdict was not supported by the evidence. The recital of the above facts requires the contrary conclusion.
 
 
 25
 A motion for severance was made by Bullock on the ground that for the Bullock group to be tried with Kasper would greatly prejudice the Bullock case. The denial of this motion by the court is assigned as reverance error. In ruling on questions of severance the District Court is vested with a wide discretion. Fed.Rules Cr.Proc. rule 14, 18 U.S.C. Such refusal is not assignable as error unless abuse of discretion is affirmatively shown. Stilson v. United States, 250 U.S. 583, 40 S.Ct 28, 63 L.Ed. 1154. In view of the close connection between Kasper and the members of the Bullock group who participated in acts of violence committed December 4, 1956, in an effort to hinder and destroy obedience to the lawful order of the court, we conclude that the discretion of the court was not abused.
 
 
 26
 Appellants contend that the District Court erred in issuing the injunction for the reason that Rule 17 of the Federal Rules of Civil Procedure, 28 U.S.C.A., was violated. They assert this because of the alleged fact that the action seeking an injunction was not prosecuted in the name of the real parties in interest.
 
 
 27
 The petition for prosecution for criminal contempt due to the violation of the permanent injunction order of September 6, 1956, was filed by the United States Attorney December 5, 1956. The first order for attachment was based upon this petition. However, the petition of August 29, 1956, praying for a temporary restraining order, was filed by the principal of Clinton High School, a member of the Board of Education of Anderson County, the Assistant Attorney General for the 19th Judicial Circuit for the State of Tennessee, and two attorneys who had been connected with the desegregation litigation of Clinton High School. These persons sought the protection of the court for the High School in their concern for the maintenance of 'respect for the laws of Tennessee and the United States and respect for the District Court and the Supreme Court of the United States. * * *'
 
 
 28
 We think the Federal Rules of Civil Procedure, including rule 17, have no application to a criminal contempt action which is instituted by notice under rule 42(b) of the Federal Rules of Criminal Procedure, Title 18. The rule governing criminal contempt are found in this rule 42, Federal Rules of Criminal Procedure, sub-section (b) of which reads as follows:
 
 
 29
 '(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.'
 
 
 30
 The provisions for arrest, bail and punishment have more of a criminal than a civil character. Since the action is punitive and sentence is imposed for the purpose of vindicating the authority of the court, United States v. Unites Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, the public has an interest in the controversy. The public interest of the parties who sought the temporary restraining order was held in McSwain v. County Board of Education of Anderson County, Tennessee, supra, to be sufficient to permit them to seek injunctive relief. The District Court stated in the first Kasper case (Kasper v. Brittain) that in criminal contempt it was 'only necessary for some reputable pary of parties to make known to the Court that a prima facie case exists that the Court's order is being violated.' Inasmuch as this court upheld the conviction on appeal this point has been adjudicated. Also, appellants, not having appealed from the order of the injunction, have waived the right to attack the court's jurisdiction in a criminal contempt proceeding. Jennings v. United States, 8 Cir., 264 F. 399.
 
 
 31
 The further contention that the injunction of August 29, 1956, is invalid under Federal Rule of Civil Procedure 65 because there was no showing of immediate and irreparable injury in the petition for the temporary restraining order also is without merit. This order was issued without notice to Kasper and certain other named persons. However, it was alleged in substance in the petition that immediate and irreparable injury would be sustained by the school and Anderson County if the actions of the defendants were not restrained. The temporary restraining order in its terms specifically complied with the provisions of rule 65, whether or not the Rules of Civil Procedure by considered applicable here. The petition described picketing at the school with large and threatening crowds continuously keeping students from the school, an attack being made upon a negro child. This constitutes in effect an allegation of immediate and irreparable reparable injury. A full hearing was had with respect to the permanent injunction. Even if the injunction was invalid, appellant was chargeable with criminal contempt for violating it, for the order of the District Court was in full force and effect until set aside in an orderly way. United States v. United Mine Workers of America, supra, 330 U.S. at pages 290, 291, 292, 67 S.Ct. at page 694.
 
 
 32
 The District Court had jurisdiction to issue the injunction. Title28 U.S.C. 1651. As pointed out by Chief Judge Simons in Kasper v. Brittain, supra, it would seem that the case of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083, its associated cases, and the judgment of this court in McSwain v. County Board of Education of Anderson County, Tennessee, supra, constitute a conclusive response to appellants' contentions on this point. As the Supreme Court stated in Brown v. Board of Education, supra:
 
 
 33
 'In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power.'
 
 
 34
 Brewer v. Hoxie School District No. 46 of Lawrence County, Arkansas, 8 Cir., 238 F.2d 91, 98, in a full review of the question declared:
 
 
 35
 '* * * jurisdiction of the federal courts to issue injunction to protect rights safeguarded by the Constitution is well established. See * * * Bell v. Hood, supra, 327 U.S. (678) at page 684 (66 S.Ct. 773, at page 777, 90 L.Ed. 939), * * * 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' An injunction will issue wherever necessary 'to afford adequate protection of constitutional rights,' Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322. Federal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available.'
 
 
 36
 To the same effect see Kasper v. Brittain, supra.
 
 
 37
 All appellants contend that it was reversible error to substitute for the order of attachment issued December 5, 1956, the amended order issued February 25, 1957. They urge that the amended attachment order changed the original proceedings from one arising out of a civil suit to a prosecution for criminal conspiracy by the United States against individuals not originally named and others. This contention in material points is not correct. The original petition filed August 29, 1956, prayed for injunctive relief against the picketing of the high school and also asked the court to issue show cause orders why Kasper and five others should not be held in contempt of the orders of the court. The amended order did not allege violation of the conspiracy statute, Title 18 U.S.C. 371, but charged criminal contempt.
 
 
 38
 Rule 42 of the Federal Rules of Criminal Procedure provides that criminal contempt actions are initiated neither by indictment nor by information, but by simple notice. The requirements of the section are less strict and technical than those of the statutes under which criminal causes are instituted. The contempt proceeding is summary in character and technical pleadings are not required. MacNeil v. United States, 1 Cir., 236 F.2d 149, certiorari denied 352 U.S. 912, 77 S.Ct. 150, 1 L.Ed.2d 119. See also United States v. United Mine Workers of America, supra, 330 U.S. at pages 296-297, 67 S.Ct. at pages 697, 698. In that case the contempt described in the petition was not denominated 'criminal as required by the rule.' Defendants urged that the omission of the words 'criminal contempt' from the petition and rule to show cause was prejudicial error. The Supreme Court held that Rule 42(b) 'requires no such rigorous application' and stated, 'Its purpose was sufficiently fulfilled here * * *.'
 
 
 39
 Decisions involving requirements for the framing or amending of indictments are not applicable. We therefore do not discuss many authorities relied on by appellants.
 
 
 40
 Appellants contend that the second attachment order violated Rule 7(e) of the Federal Rules of Criminal Procedure which provides that the court may permit an information to be amended at any time before the verdict if no additional offense is charged and if substantial rights of the defendant are not prejudiced.
 
 
 41
 No rights of the appellants were violated by the issuance of the second attachment. The original attachment and the amended attachment each charged the same offense, namely, criminal contempt. The temporary restraining order of August 29, 1956, enjoining and restricting John Kasper and others from hindering, obstructing, or in anywise interfering with the carrying out of the integration order of January 4, 1956, was addressed not only to the agents, servants, representatives and attorneys of Kasper and others, but to 'all other persons who are acting or who may act in concert with them * * *.' The addition in the amended order for attachment of an allegation of an agreement to violate and cause others to violate the injunction in active concert and participation with Frederick John Kasper fell within the terms of the temporary restraining order of August 29, 1956, made permanent on September 6, 1956. The essence of the charge in both attachment orders was that appellants had violated the injunction of the District Court. No additional offense was charged. Appellants were cited both in the original order and the amended order. Kasper, the only appellant added by the amendment, makes no objection on this point.
 
 
 42
 Neither were appellants prejudiced by the amendment. While the overt acts charged in the original attachment were previous to and hence different from those charged in the amended order, appellants had ample notice of all acts charged and full understanding of what they were. Cf. United States v. United Mine Workers of America, supra, 330 U.S. at pages 296, 297, 67 S.Ct. at page 697, 91 L.Ed. 884. The amended order was issued on February 25, 1957. The trial started on July 8, 1957, and appellants had ample opportunity to prepare for hearing.
 
 
 43
 The fact that Kasper's application for a bill of particulars was refused is not material. The charge was specific and detailed. Kasper was not entitled to be given details of the government's evidence to be presented at the trial. Kansas City Star Company v. United States, 8 Cir., 240 F.2d 643.
 
 
 44
 It is urged that reversible error existed because before the hearing appellants requested the production of all statements and other matter bearing on the testimony which might be given by Government witnesses. This request was renewed at the trial. The court ruled that appellants would be entitled to receive statements of a witness produced by the Government only after the witness had testified. Also the court deleted portions of certain statements which it considered not relevant. Relying on Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103, appellants contend that the pretrial production of all statements given to the FBI in the case is required. On the contrary, the Jencks opinion points out that the petitioner was entitled to an order directing the production of statements 'touching the events and activities' as to which certain witnesses 'testified at the trial.'
 
 
 45
 The statute, 18 U.S.C. 3500, enacted shortly after the announcement of the Jencks case, expressly prohibits pre-trial discovery of such reports. It is significant that the Senate Report upon the Bill, No. 981, 85th Congress, 1st Session, Appendix p. 8, U.S. Code Congressional and Administrative News 1957, p. 1866, states that the provision prohibiting pre-trial disclosure was inserted to avoid the misinterpretation of Jancks v. United States which had occurred in some court decisions, a matter which was surprising to the Committee, particularly when the 'overwhelming judicial thought * * * (is that Jencks) does not apply to pretrial production.' Pre-trial discovery of such material has been denied in numerous district court cases subsequent to the Jencks case.
 
 
 46
 The Government's appendix shows that the court complied fully with the principle of Jencks v. United States. In fact, it presents many instances in which material asked for from a particular witness was placed at the disposal of appellants' attorney at the opening of the examination. Since such reports must be of the events and activities related in the testimony, Jencks v. United States, supra, clearly the trial court must determine whether the statement or portions thereof touch upon such events and activities. It was not error for the District Court to screen the reports to determine whether some part of them was irrelevant and immaterial.
 
 
 47
 Various prejudicial errors are claimed to exist in the charge. With reference to the attack on Rev. Turner the court characterized Rev. Turner's act in conducting the negro children to the high school as a 'well-intentioned contribution' and as a 'good deed.' Appellants say this was an invasion of the province of the jury. Whatever influence these words might have had against appellants was wiped out by the later charge of the court that 'From the standpoint of segregation it might not be considered a well-intentioned contribution.' The court properly left it to the jury to determine what Rev. Turner's intention was.
 
 
 48
 It is also contended that the District Court did not adequately charge the jury that the prosecution must prove beyond a reasonable doubt the agreement or agreements between appellants.
 
 
 49
 The court instructed the jury that before it could convict it must find three facts:
 
 
 50
 (1) That appellants had notice of the injunction.
 
 
 51
 (2) That appellants committed acts in violation of the injunction in concert with Kasper.
 
 
 52
 That these acts had the effect of hindering or obstructing the integration of the Clinton High School in violation of the injunction.
 
 
 53
 Under the charge the jury was required to be convinced beyond a reasonable doubt of the existence of each of these elements of the offense before it could convict. Read as a whole the charge is fair and accurate.
 
 
 54
 Also, appellants claim that the refusal of the court to charge that the failure of the Government to subpoena any of the negro high school children raised a presumption that their testimony would be unfavorable to the Government. The refusal was not erroneous. It was not shown to be peculiarly within the power of the Government to produce the witnesses. It is only when this fact appears that the presumption arises. McGuire v. United States, 84 U.S.App.D.C. 64, 171 F.2d 136. As the witnesses were equally available to both parties, the court did not err in refusing the instruction. Shurman v. United States, 5 Cir., 233 F.2d 272.
 
 
 55
 Appellants also say it was reversible error for the lower court to allow the court clerk to issue to each member of the jury panel a publication entitled 'Handbook for Jurors serving in the United States District Courts.' This contention relies upon People v. Weatherford, Cal., 160 P.2d 210; People v. Schoos, 399 Ill. 527, 78 N.E.2d 245, 2 A.L.R.2d 1096, and United States of America v. Gordon, 7 Cir., No. 11,929, opinion on July 16, 1957. In the latter case the judge of the District Court had distributed the same pamphlet given out by the court in the case at bar and this was held to be reversible error. However, in United States v. Gordon, 7 Cir., 253 F.2d 177, a case heard by the court en banc, the former opinion issued July 16, 1957, was superseded and withdrawn. The Court of Appeals said that, assuming the entire panel read the handbook and that the handbood contained statements inimical to a defendant in a criminal case, the defendant had the right of challenge to the polls. Failure to make the objection on the voir dire examination, the court held, constitutes a waiver, for jurors cannot be challenged for bias by a motion for new trial. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187. Under this authority the objection was waived in the instant case, for no objection was made on the voir dire examination.
 
 
 56
 Also, we hold that the District Court did not err in distributing this handbook. It was a pamphlet for the instruction of jurors authorized by the National Judicial Conference, composed of the chief judges of all the circuits, and framed by a committee of highly distinguished jurists. It was not shown that the pamphlet contained anything prejudicial to appellants. We agree with Chief Judge Duffy of the Seventh Circuit, who stated in United States v. Gordon, supra, 253 F.2d at page 186, that the theory of the handbook was that 'an informed juror who understood something of the proper functions of a juror could do a better and more intelligent job than one who went into the jury box with a blank mind and with none but the vaguest ideas of where a juror fitted into the federal judicial picture.'
 
 
 57
 This court gave extensive consideration to the question of using the Handbook for Jurors in Horton v. United States and Johnson v. United States, companion cases reviewed in 6 Cir., 256 F.2d 138, 143. Contentions similar to those made herein were raised in the Horton case, supra, namely, that the use of the handbook is an encroachment upon the jury system and denies appellants a fair and impartial trial. Chief Judge Simons, speaking for the court, said:
 
 
 58
 'The challenged language of the handbook, read in context, instructs the jurors that the Judge determines the law to be applied while the jury decides the facts, that the judge declares the law to be and his law controls, that the jury must determine what are the true facts and the jurors are sworn to disregard prejudices and follow the court's instructions and they violate their oath if they render their decision on the basis of the effect their verdict might have in other situations. To say that the challenged statement impinged upon the independent judgment of the jurors would downgrade the intelligence of Federal jurors, impute lack of conscience to them, and defiance of judicial instructions and open the doors to innumerable appeals and petitions of guilty defendants tried by juries which had received the handbook. Upon such thin assumptions as are here advanced, this ought not to be done.'
 
 
 59
 See also People v. Lopez, 32 Cal.2d 673, 197 P.2d 757; United States v. Allied Stevedoring Corporation, 2 Cir., 258 F.2d 104, 106, 107.
 
 
 60
 Various constitutional questions are raised by appellant Kasper which require little discussion. Kasper claims that the injunction issued by the District Court violates the free speech provision of the First Amendment to the Constitution. As held in Kasper v. Brittain, supra, the right to speak is not absolute. The First Amendment does not confer the right to persuade others to violate the law, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834.
 
 
 61
 Neither was Kasper twice put in jeopardy by his second conviction of criminal contempt. The first finding of guilty grew out of Kasper's individual contempt committed on August 29, 1956. Kasper v. Brittain, supra. The present conviction grew out of a separate and subsequent contempt, consisting of Kasper's acting in concert with others to violate the permanent injunction issued September 6, 1956. The jury evidently found that it was Kasper's continuing purpose, as he declared, to stay in Anderson County, Tennessee, until the negroes were thrown out or put out. The jury was entitled to consider that Kasper's activities subsequent to August 31, 1956, were directed, in concert with other defendants convicted, to the achievement of this purpose.
 
 
 62
 Under the Constitution Kasper is not immune from prosecution for contempt of court committed in November and December, 1956, simply because he was found guilty of a similar contempt which occurred in August, 1956. Successive and separate contempts are punishable as separate offenses. Jennings v. United States, supra. Cf. Tobin v. Pielet, 7 Cir., 186 F.2d 886.
 
 
 63
 Kasper also urges that he was denied the right to a speedy trial guaranteed by the Sixth Amendment because four months passed from the time the amended order of attachment issued to the time of trial. The right to a speedy trial is necessarily relative. Beavers v. Haubert, 198 U.S. 77, 25 S.Ct. 573, 49 L.Ed. 950. The Sixth Amendment does not guarantee an immediate trial. No prejudice and no features of arbitrary, oppressive or vexatious delay were shown. Cf. Chinn v. United States, 4 Cir., 228 F.2d 151.
 
 
 64
 Furthermore Kasper contends that he was denied due process of law under the Fifth and Sixth Amendments upon the ground that the Attorney General and the Director of the Bureau of Prisons refused to transfer him from a Federal prison in Florida to a prison in or near Washington, D.C. Kasper's attorney was located in Washington and Kasper claims that this denial of transfer deprived him of effective assistance of counsel. This objection is overruled. The record shows that Kasper was effectively assisted by counsel. Also, nothing in the Constitution guarantees a prisoner serving a lawful sentence the right to be transported to another locality to be near his attorney on appeal.
 
 
 65
 A further question presented on this appeal is the contention that the jury was tampered with by employees of a broadcasting company producing a network television program while the trial was in progress in which the foreman of the jury, Mr. Powell May, was directly involved. The facts are developed on motion for new trial which was denied by the trial court. The court had instructed the jury not to view television programs, read the papers or listen to radio accounts of the case. May was invited by his next door neighbor, Mrs. Ray Carroll Jones, to come to her house and view a television broadcast in which Mr. Jones was to be shown. It does not appear that May was told the subject of the program. When questioned about the invitation May said, 'I want to explain that we have no television receiver and (are) not particularly interested in television shows and knew nothing about the preparation of this particular program. * * * We did not know who it concerned * * *.' These statements are not contradicted.
 
 
 66
 There is no evidence that the network secured or tried to get May's presence for the broadcast. While May failed to follow the court's instructions, there is no evidence of an intention, either upon the part of the network or of Mr. and Mrs. Jones, to influence May in the case.
 
 
 67
 Defendants claim that the subject of the broadcast was 'Will a Southern Jury Convict?' A woman testified that she viewed the telecast, that the announcer said that 'a Southern jury wouldn't convict anyone,' and that May was identified as being on the jury.
 
 
 68
 This woman did not listen to the telecast at the home of Jones. It is undisputed that May came into the Jones home after the particular telecast had begun. May repeatedly declared under oath that the phrase 'Will a Southern Jury Convict?' was not used and that that subject was not the theme of the broadcast. The fact that he went to the Jones home after the announcer had begun supports May's statement, for he well could have missed the announcement of a general theme, if any. What May saw on the screen was his next door neighbor Jones and the pastor of May's church being interviewed. The subject seemed to be May as an individual. May testified that no mention of the trial proceedings was made. Both Jones and May's pastor bore witness to May's high character and integrity. Each in effect stated that he believed May would render an honest decision in a trial.
 
 
 69
 Defendants urge that under these circumstances Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435, holds that a presumption of prejudice exists and requires the conclusion that reversible error was established. In the Remmer case, supra, 350 U.S. at page 380, 76 S.Ct. at page 427, it was shown that a private party had suggested to a juror that the defendant (one Bones Remmer) had 'sold Cal-Neva for $850,000 and really got about $300,000 under the table which he daresn't touch. Why don't you make a deal with him?' The juror vigorously stated that he could not talk about the case. The court consulted with the district attorney and the FBI investigated the matter, but defendant and his counsel were not apprised of the investigation. The juror was deeply distressed by the incident and stated to another juror after the trial that he had 'been under a terrific pressure.' The Supreme Court held that the juror had been 'subjected to extraneous influences to which no juror should be subjected, for it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made,' and held that petitioner was entitled to a new trial.
 
 
 70
 On the facts presented the Remmer case is plainly distinguishable from the instant case.
 
 
 71
 May was not approached with reference to the instant case. A neighborly invitation brought May over to the Jones house. Moreover, it is questionable whether the rule of the Remmer case is applicable to a public broadcast. The Remmer case presented a situation of proven tampering by private parties. Here no tampering is proved. The situation here presented arises in many instances where, as here, the jury is not confined for the duration of the trial. As Mr. Justice Holmes, speaking for the Supreme Court, declared in Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 6, 54 L.Ed. 1021, 'If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.' Despite the admonitions of trial judges, many jurors read newspaper accounts or hear reports on radio and television concerning the trial in which they are serving. This fact does not of itself invalidate the verdict. Prejudice must be shown. Cf. United States v. Catalano, 2 Cir., 231 F.2d 67.
 
 
 72
 Although the trial court had already charged the jury in the instant case not to view television or read or listen to accounts of the trial, it recognized the frequent destruction of comnized isolation that arises through radio and television for persons sitting on the jury. The court therefore charged the jury to disregard completely any impressions or information received from other sources, such as radio, television or newspaper articles. Under Fed.Rules of Cr.Proc., rule 33, the trial judge is vested with a wide discretion in the granting of a new trial. We think that discretion was not abused. May did not seek to view the broadcast. May's neighbor and his minister were the only persons besides the announcer who appeared on the broadcast. The neighbor was a segregationist, the minister an anti-segregationist. Each spoke in the highest terms of May's integrity and judgment. We conclude that the District Court's finding that May was not influenced by the broadcast was not clearly erroneous. It is for the judge to decide whether or not private communication is prejudicial. The same rule applies with even more force to public communication which reaches a juror without intention on the part of the broadcaster. In numerous decisions the trial judge has held that a new trial should not be had, although information that superficially appeared prejudicial was transmitted to the jury. Instances where the court held prejudice was not shown include the following: Gicinto v. United States, 8 Cir., 212 F.2d 8, certiorari denied 348 U.S. 884, 75 S.Ct. 125, 99 L.Ed. 695; United States v. Allied Stevedoring Corp., 2 Cir.,241 F.2d 925, certiorari denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143 (seven jurors read account of association of defendant with another man who had been indicted for the same offense); Reining v. United States, 5 Cir.,167 F.2d 362, certiorari denied 335 U.S. 830, 69 S.Ct. 49, 93 L.Ed. 383 (newspaper account reported that defendant's accomplice was dead and that he had said he would rather take his life than face prosecution); Miller v. Commonwealth of Kentucky, 6 Cir., 40 F.2d 820 (newspaper articles on the trial found not inaccurate and the court held there was no prejudice). See31 A.L.R.2d 417.
 
 
 73
 Briggs v. United States, 6 Cir., 221 F.2d 636, and Krogmann v. United States, 6 Cir., 225 F.2d 220, 228, are not in conflict with this decision. In each of these two cases newspaper publicity unfavorable to the defendant was read by members of the jury. Here it is uncontradicted that the broadcast contained no mention of appellants and no discussion of facts tending to prove their guilt or innocence of the pending contempt charge. Moreover, the court charged the jury in forcible terms to ignore any newspaper publicity or broadcasts. No person or organization attempted to tamper with the jury. The publication was not caused by improper action of any government officer. Cf. Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740. The ruling here was well within the range of discretion vested in the trial judge. In accord see United States v. Postma, 2 Cir., 242 F.2d 488.
 
 
 74
 We conclude that the court's decision that May was not in any respect influenced in his verdict by reason of the television program is amply supported by the evidence.
 
 
 75
 All questions presented have been considered. We find no reversible error in the record.
 
 
 76
 The judgment is affirmed.
 
 
 77
 On Petition for Rehearing.
 
 
 78
 (No. 13513).
 
 
 79
 Due to an ill-prepared and confusing appendix which did not use the name of Cook or any name in connection with certain statements, the opinion declared that these statements were those of Kasper. This was an error. These words were spoken by Cook.
 
 
 80
 Not all of the evidence against Kasper adduced in the second trial with reference to violation of the injunction consists of the same facts that were presented in the trial of the first contempt charge. Some of these facts were necessarily considered as background to the case but much evidence was introduced concerning Kasper's activities subsequent to his first conviction (August 31, 1956) and also subsequent to the issuance of the permanent injunction (September 6, 1956).
 
 
 81
 The jury had the whole record before it, not merely an appendix. It was entitled to infer from the facts proven that there were definite concert and conspiracy between Kasper and the other defendants convicted. For instance, when Bullock presented a petition calling for ouster of Brittain as principal of the school, several weeks after Kasper's first conviction and after the issuance of the permanent injunction, the jury could justifiably find that Bullock was carrying out the threat made by Kasper personally to Brittain to get Brittain out of the school 'before the year was over or the Negroes out * * *.' There is no indication in this record that Kasper abandoned this purpose during the period in controversy.
 
 
 82
 The jury was not compelled to ignore the fact that Kasper, not shown to be a resident of Tennessee, remained in Clinton in close association with the aggressive opponents of the permanent injunction up to around December 4, 1956. The jury might rightfully conclude that Kasper's evident purpose was in concert with other defendants to continue to incite resistance to the integration order and to put out the negroes by intimidation, threats and violence. The jury knew that Kasper was in continual conference and association with the men who actually spoke the abusive words and committed the violent acts of December 4, 1956. Cook, after abuse and profanity, said to Rev. Turner, 'You can't get away with this * * *. We won't let you', and physically assaulted Turner. Cook was not only the constant companion of Kasper during these three months, but the jury was entitled to find from these facts that Cook in doing these acts was carrying out Kasper's continuing purpose.
 
 
 83
 That Kasper was in the area for a long period between August and December, 1956, is proved by irrefutable evidence not denied by the witnesses. A police officer of Clinton from August through December 4, 1956, said that he had seen Kasper in town 'a lot', 'mostly every night' at the Southland or Ann's Cafe. He testified in detail as to the hours that he saw Kasper. Brakebill and Cook were often with him. To the question concerning the months when this happened the police officer answered, 'since this trouble started around August, on up.' He described meetings that were held by the group and said that they occurred once a week from August to December 4.
 
 
 84
 Kasper did not take the stand in the instant proceeding. He testified in the hearing on the contempt phase of the proceedings of August 30 and 31, 1956. The District Court in its decision (August 31, 1956) in discussing the question whether Kasper wilfully violated the injunction order, said that it was Kasper's object 'stated more than once', 'to get Mr. Brittain out because he was doing his duty' and that 'he was going to stay in Anderson County until the Negroes were thrown out or put out.' This finding was supported by the evidence. Moreover, Kasper in his testimony admitted telling a reporter that he was 'going to remain there and help these fellows on the picket line to keep on organizing and distributing legal literature.'
 
 
 85
 We conclude that under this record the evidence was sufficient to support a finding by the jury that Kasper was in the area around December 4.
 
 
 86
 The court adheres to its original conclusion. The petition for rehearing is denied.